# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED BROWN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>EDGAR CASTILLO, et al.,<br><br>　　　　　Defendants.<br>_____/ | CASE NO. 1:02-cv-06018-LJO-DLB PC<br><br>ORDER GRANTING DEFENDANT BUNKER'S MOTION FOR SUMMARY JUDGMENT<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO RESPOND TO DEFENDANT'S REPLY<br><br>(Docs. 151, 159, 165) |

I.   Defendants' Motion for Summary Judgment

　　A.   Procedural History

Plaintiff Alfred Brown ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed his first compliant on August 20, 2002, wherein he alleged that defendants CASTILLO, former Chief Medical Officer; CURTIS, former American with Disabilities Act Medical Coordinator; KING, Correctional Counselor II; BARBEIRO, former Medical Appeals Analyst; WALKER, Correctional Officer; BUNKER, Medical Technical Assistant (MTA); MATHOS, former Public Health Nurse; DUVALL, Inmate Appeals Coordinator; and DULAY, MTA, violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs from July 2001 until January 2002 (Doc. 1). Specifically, plaintiff alleged that during his incarceration at the California Substance Abuse Treatment Facility

1

(CSATF) at Corcoran State Prison, defendants were deliberately indifferent to his medical needs by failing to provide him with a replacement for his old wheelchair. (Complaint ¶¶ 16-18). He further alleged that on January 28, 2002, he fell out of his wheelchair and suffered physical injuries. (Complaint ¶¶ 16-18).

On April 13, 2005, plaintiff filed an amended complaint. (Doc. 67). He reasserted his claims that defendants were deliberately indifferent to his medical needs by failing to provide him with a replacement wheelchair in violation of the Eighth Amendment and that he was injured after falling from the wheelchair in January 2002. (Doc. 67). Plaintiff also alleges that defendants' conduct violated his rights under the Americans with Disabilities Act (ADA). Id.

On May 18, 2005, defendant Bunker filed a motion to dismiss the complaint for failure to state a claim. (Doc. 72). On February 21, 2006, the District Court granted defendant Bunker's motion to dismiss the ADA claim but denied the motion to dismiss the Eighth Amendment claim. (Doc. 120). Pending before the court is a motion for summary judgment defendant Bunker filed on December 27, 2007.[1] (Doc. 151). Plaintiff filed an opposition to the motion on March 1, 2007. (Docs. 157, 162).[2]

---

[1] This case has an extensive procedural history that is not outlined fully as it is not relevant to the current motion. However, it is noted that the other defendants in this case filed a motion for summary judgment on September 27, 2005. Their motion will be addressed in a separate order.

As part of the motion for summary judgment, defendant Bunker has requested that the court take judicial notice of plaintiff's amended verified complaint filed on April 13, 2005. Plaintiff's motion for judicial notice shall be denied. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Judicial notice is an adjudicative device that alleviates the parties' evidentiary duties at trial, serving as a substitute for the conventional method of taking evidence to establish facts." York v. American Tel. & Tel. Co., 95 F.3d 948, 958 (10th Cir. 1996) (internal quotations omitted); see General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997). No purpose is served by taking judicial notice of the fact that plaintiff filed a verified complaint. The facts contained within it are subject to dispute, making them inappropriate for judicial notice.

[2] Plaintiff also filed an opposition to the use of his deposition taken May 24, 2005, because the defendant failed to provide the plaintiff with a verified copy of his deposition. In this motion, plaintiff requests that sanctions be granted and that the motion be denied on that basis. (Doc. 159). Defendant Bunker filed an opposition to plaintiff's objection to the use of the transcripts arguing that he was not required to provide plaintiff with his own copy of the deposition and that the local rules require that the relevant portions of the transcript be provided in support of his motion for summary judgment. (Doc. 161).

The defendant is correct and plaintiff objections are misplaced. Pursuant to Rule 30(f)(2) of the Federal Rules of Civil Procedure, a party may obtain a copy of the deposition upon reasonable payment of fees. Therefore, plaintiff is only entitled to a copy of the deposition if he requested one and paid for it. There is no provision under the Federal Rules or the Local Rules for free copies of deposition transcripts. Further, the expenditure of public funds on behalf of an indigent litigant is proper only when authorized by Congress. See Tedder v. Odel, 890 F.2d 210 (9th Cir. 1989) (citations omitted). The in forma pauperis statute does not authorize the expenditure of public

2

Defendant Bunker filed a reply to plaintiff's opposition on March 9, 2006. (Doc. 160). Plaintiff also filed leave to respond to defendant Bunker's reply to the motion for summary judgment. (Doc. 165). The court will grant plaintiff's motion and has considered all of these documents in determining the merits of the motion for summary judgment.

      B.    <u>Legal Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

---

funds for the purpose sought by plaintiff in his objection.

1  support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The
2  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect
3  the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
4  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987),
5  and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
6  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th
7  Cir. 1987).

8       In the endeavor to establish the existence of a factual dispute, the opposing party need not
9  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual
10 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
11 trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the
12 pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
13 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
14 amendments).

15      In resolving the summary judgment motion, the court examines the pleadings, depositions,
16 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).
17 The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable
18 inferences that may be drawn from the facts placed before the court must be drawn in favor of the
19 opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655
20 (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing
21 party's obligation to produce a factual predicate from which the inference may be drawn.  Richards
22 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th
23 Cir. 1987).

24      Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show
25 that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole
26 could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
27 trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).
28 ///

C.     Plaintiff's Claims

Plaintiff alleges that on July 15, 2001, he filed an emergency ADA, CDC appeal with defendant Edgar Castillo, former Chief Medical Officer, because his wheelchair would not roll, the wheels were wobbling, and the bearings were making loud cracking sounds. (Am. Comp. at 1). On July 25, 2001, defendant Castillo ordered that plaintiff's wheelchair be repaired. Id. Plaintiff alleges that defendants Castillo and Curtis, R.N., ADA Medical Coordinator were contacted on several occasions to get the wheelchair repaired between July 2001 and January 28, 2002 when he fell out of the wheelchair. Id. at 2-3.

Specifically, plaintiff alleges nothing had been done to repair his wheelchair from July 25, 2001, until October 2001. He subsequently filed an appeal to the third level, the Director's level of review, because no repairs had been made. Id. at 3. He alleges that the appeal was returned to defendant Doris Duvall, the appeals coordinator. Id. He never heard from defendant Duvall. Id.

Plaintiff alleges that in November 2001, defendant Curtis brought a wheelchair to replace the plaintiff's old wheelchair but did not make the required adjustments. Id. at 4. He alleges that defendant Curtis did not wait for the plaintiff to go pick up the chair so that it could be adjusted. Id. Instead, plaintiff alleges that defendant Curtis left the wheelchair with MTA Behrens on the E-yard. Plaintiff alleges that MTA Behrens told the plaintiff that defendant Curtis said he did not want to see the plaintiff. Id. Plaintiff believes that the reason that defendant Curtis did not want to see him was because of the numerous calls and complaints that had made about the wheelchair not being repaired. Id. at 4-5. Upon receiving the wheelchair, plaintiff alleges that it was too wide to fit through the cell door in the building. Id. The new wheelchair was exchanged for the plaintiff's old wheelchair so that adjustments could be made on Monday. Id. In the interim, the wheelchair was given to another inmate. Id at 6. The new wheelchair was never returned to the plaintiff.

Plaintiff alleges several attempts to get this wheelchair repaired were made by contacting defendants Curtis and Castillo but there was no response. Id. at 7. He filed another a second emergency appeal on November 18, 2001. Id. Plaintiff alleges MTA Behrans attempted to contact defendants Castillo and Curtis about the repairs not being made and nothing happened. Id. MTA Behrens took plaintiff's complaint to Derrall Adams, the Warden, and it was reported that the appeal

5

1  he filed should be put through as an emergency appeal.

2  On December 17, 2001, plaintiff was contacted by defendant King, Correctional Counselor
3  II, in response to the appeal he had filed in December 2001. Id. at 7. At that time, plaintiff informed
4  defendant King about this history of his wheelchair repair. Id.  On or about December 20, 2001,
5  plaintiff received a second level response from defendant Barbeiro, former Medical Appeals Analyst,
6  and defendant Castillo, indicating that an appointment to repair the wheelchair would be made by
7  defendant Walker, Correctional Officer.  If an appointment was not made, plaintiff should contact
8  defendant Walker to arrange a time to get the wheelchair repaired. Id. at 8.  Plaintiff alleges that
9  defendant Walker was contacted by MTA Behrens to repair the chair and that defendant Walker told
10 MTA Behrens he would come and get the wheelchair that day. Id. at 8.  Defendant Walker never
11 came to pick up the wheelchair. Id.  Several calls were made to defendants Kings and Barbeiro about
12 the appointment not being kept but there was no response. Id.

13 On December 27, 2001, plaintiff alleges that the right footrest broke off of his wheelchair due
14 to the lack of repair of the chair. Id. at 8-9.  As a result, he experienced pain because he had to cross
15 his right leg over his left leg to keep his right foot from dragging on the floor. Id. On December 28,
16 2001, plaintiff talked with MTA Behrens who called defendant Walker and was told by defendant
17 Walker that "he would get there when he got there." Id. at 9.

18 On January 2, 2002, plaintiff saw defendant Jason Bunker and related the history and the
19 concerns about his wheelchair to him. Id. at 10.  Plaintiff alleges defendant Bunker called defendant
20 Walker. Id. at 10. Defendant Bunker told plaintiff that he had spoken to defendants Walker and
21 Mathos and was told that they were aware of the problem and they were handling it. Id.  Defendant
22 Bunker told plaintiff that he would not help him anymore. Id.

23 On January 8, 2002, plaintiff alleges he resubmitted the appeal. Id. at 11.  Plaintiff alleges that
24 rather than deal with the appeal, defendant Duvall, Appeals Coordinator, forwarded the appeal to the
25 Director's level, the third level of review. Id. at 11.

26 On January 9, 2002, plaintiff attempted to interview Defendant Mathos but did not get a
27 response. Id. at 11.  After that point, plaintiff alleges he would go to the MTA medication window
28

on the E-yard repeatedly and when he tried to ask about the wheelchair, the staff would close the office window and he was ignored. Id. at 11-12. Plaintiff alleges he went back to the MTA window requesting an interview with defendants Castillo, King, Walker, Barbeiro, Duvall, and Mathos but his requests were ignored. Id. at 12.

Plaintiff alleges his wheelchair broke causing him to fall out of the wheelchair on January 28, 2002. Id. at 13. Plaintiff was given medical care and he was returned to his cell where he was ordered to say in bed for two days pending a medical follow-up. Id. A brand new wheelchair was brought to his cell. Id.

Later that day, defendant Walker came to plaintiff's room with plaintiff's old wheelchair claiming that it had been fixed and requested that plaintiff return the new wheelchair. Id. at 14. Plaintiff alleges that defendant Walker was indignant and sarcastic and requested that plaintiff return the new wheelchair in exchange for his old chair. Id. Plaintiff alleges that the right arm rest was still broken and unfixed from the incident, the bottom of the wheelchair was still dropping out, and the right footrest had still not been repaired. Id.

On January 29, 2002, plaintiff was not allowed to stay in bed because the medical lay-in had not been posted. Id. at 15. Plaintiff alleges that he went to the MTA's window and spoke to defendant Dulay, Medical Technical Assistant. Plaintiff wanted to see the doctor for severe lower back pain and bumps and numbness in his legs. Id. Plaintiff alleges that defendant Dulay told him that plaintiff could not see the doctor until January 30, 2002, even though the doctor was available on the day of the request. Id.

On February 21, 2002, plaintiff filed a tort claim for CDC inmates which was rejected. Id at 16. On February 21, 2002, plaintiff alleges he contacted defendant Duvall about the appeals that were not processed regarding the old wheelchair. Id. Plaintiff was interviewed by defendant Duvall. Id. He alleges that she deliberately confused issues with regard to his appeal by construing his concerns to relate to the new wheelchair which resulted in the Director denying his appeal on March 5, 2002. Id. at 16-17.

On March 12, 2002, plaintiff filed another ADA emergency appeal. Id. at 17. He alleges he

was transferred from the E-yard to the C-yard on March 16, 2002, as a form of punishment for filing the appeal. Id. He also alleges he was pressured to withdraw that appeal and was forced to purchase the "older" wheelchair which had caused his injury. Id at 17.

D. <u>Summary of Undisputed Facts</u>

    1. Plaintiff was incarcerated at CSATF at all times mentioned in the amended complaint.

    2. Plaintiff is 350 pounds, 6 feet, 8 inches tall, and utilizes a wheelchair for mobility at CSATF due to a medical condition.

    3. In December 2001, plaintiff filed a CDC 1824 Form requesting wheelchair repairs or replacement. He received a second level response from CSATF Medical Appeals Coordinator T. Barbiero and Chief Medical Officer E. Castillo, M.D., on or about December 20, 2001. The response indicated that an appointment to repair plaintiff's wheelchair by Correctional Officer Walker had been scheduled for approximately December 20, 2001. The response further instructed plaintiff to contact Officer Walker if the wheelchair was not repaired and another appointment would be scheduled as soon as possible.

    4. On the morning of January 2, 2002, plaintiff went to the MTA office where plaintiff was housed to speak about obtaining repairs to the plaintiff's wheelchair as his wheelchair had no yet been repaired.

    5. As of January 2002, defendant Bunker's regular assignment was working with the Correctional Treatment Clinic (CTC) at CSATF. However, on January 2, 2002, defendant Bunker was substituting as MTA on the E-yard facility that day.

    6. Prior to January 2, 2002, defendant Bunker had not met plaintiff and did not know anything about Brown's request for wheelchair repairs.

    7. When plaintiff arrived at the E-yard MTA's office, he related his story regarding his wheelchair to MTA Bunker and showed Bunker his complaint forms regarding the issue of his wheelchair.

    8. Defendant Bunker immediately called to inquire regarding the wheelchair issue. MTA Bunker then informed the plaintiff that he was going to call the CTC at the facility to get an

understanding of what was going on.

9. Defendant Bunker told plaintiff that he should come back later that morning and wrote a pass for plaintiff to return to the office. Plaintiff then left the MTA office.

10. Defendant Bunker then spoke with defendant Mathos at the CTC who was defendant Bunker's first supervisor at the time. Defendant Mathos informed Bunker that they were well aware of plaintiff's request and instructed defendant Bunker not to pursue the matter further as plaintiff's wheelchair request was being taken care of.

11. Plaintiff returned to the MTA's office at about 9:00 am. He was informed by defendant Bunker that Bunker had contacted defendant Mathos at the Clinic. Defendant Mathos had told Bunker that she was aware of the issue regarding plaintiff's wheelchair and that the issue was being handled. Defendant Bunker returned plaintiff's paperwork to him.

12. January 2, 2002, was the only date that plaintiff spoke with defendant Bunker regarding his request for a wheelchair repairs/replacement.

E. Defendant Bunker's Motion and Reply to Plaintiff's Opposition

Defendant Bunker argues his actions simply to do not rise to the level of a constitutional violation given the above facts. Defendant Bunker only saw the plaintiff on one occasion and immediately made several phone calls to ascertain the status regarding plaintiff's request for wheelchair repairs. He was informed by his immediate supervisor not to pursue the matter further because it was being taken care of. The fact that defendant Bunker was informed by the clinic that they were aware of the issue and that the issue was being addressed does not constitute deliberate indifference to plaintiff's medical care. Alternatively, defendant Bunker argues that even if the court were to determine that he did violate plaintiff's constitutional rights, he is entitled to qualified immunity.

Defendant Bunker argues that the only disputed fact remaining is whether he had the equipment or knowledge to repair plaintiff's wheelchair, or the power to order anyone else at CSATF or elsewhere to repair plaintiff's wheelchair. Defendant Bunker argues that he did not have the authority given his limited involvement in the case. Defendant Bunker also argues that plaintiff's self

serving statements regarding defendant Bunker's motivation, knowledge, and authority, without more, is insufficient to overcome defendant's understanding of his authority at CSATF.

### F. Plaintiff's Opposition

Plaintiff alleges that when he first approached defendant Bunker, he informed Bunker of the issues he was having with his wheelchair and the history of his efforts to have it repaired. Indeed, accordingly to plaintiff's allegations, at the time he approached defendant Bunker, the right footrest was broken and plaintiff was required to cross his right leg over his left leg to keep his right foot from dragging on the ground. The bearings were also making noise. Plaintiff contends that defendant Bunker was helpful at first and indicated that he would inquire into the status of the needed repairs. However, plaintiff alleges that when he saw Bunker later, Bunker was hostile, short and essentially told plaintiff he was not going to help him.

In plaintiff's opposition to defendant Bunker's motion, he argues that defendant Bunker had other options at his disposal that were outlined in the operations manual to address plaintiff's wheelchair issues. Furthermore, the poor condition of plaintiff's wheelchair at the time defendant Bunker became involved required defendant Bunker to take further action rather than rely on his supervisor's directives.

### G. Discussion

A prisoner's claim does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)). The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). A serious medical need is one in which the failure to treat a condition could result in further significant injury or to the unnecessary and wanton infliction of pain. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992). Second, the prison official must act with a "sufficiently culpable state of mind," which entails more

than mere negligence, but less than conduct undertaken for the very purpose of causing harm. Farmer v. Brennan, 511 U.S. at 837. A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Id.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

a. Objective Component

The non-repair of plaintiff's wheelchair is a denial of serious medical need. A medical need is serious if the failure to treat it "'could result in further significant injury or the unnecessary and wanton infliction of pain.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting McGuckin, 974 F.2d at 1059 (quotations and citation omitted)). "[T]he existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, . . . the presence of a medical condition that significantly affects an individual's daily activities, and . . . the existence of chronic or substantial pain" are indications of a serious medical need. Doty v. County of Lassen, 37 F. 3d 540, 546 n.3 (citing McGuckin,, 974 F. 2d at 1059-1060).

Plaintiff is immobile without the wheelchair which effects his activities of daily living and a reasonable doctor would find the non-repair of plaintiff's wheelchair worthy of comment. Significant injury can also result if the condition of the wheelchair is compromised. Thus, plaintiff is denied the minimal civilized measure of life's necessities when he is not able to use the chair safely. Therefore, the objective component of the deliberate indifference standard is met.

b. Subjective Component

In this case, the subjective component is not met because Defendant bunker did not possess

the culpable state of mind to establish deliberate indifference. Defendant Bunker's sole interaction with the plaintiff occurred on one day when defendant Bunker became aware of the plaintiff's problems with his wheelchair while he was the substituting MTA on the E-yard. Plaintiff does not dispute that defendant Bunker immediately took action by inquiring into the status of the repairs by calling his supervisor in an attempt to remedy the situation. UDF 8, 10. Bunker was told that plaintiff's request was being taken care of and not to pursue the matter further. UDF 11. Furthermore, defendant Bunker asserts that he believes he has no power or authority to order anyone else at CSATF to repair wheelchairs. Thus, he did not believe that he had the power to do more.

The fact that defendant Bunker inquired about the status of plaintiff's request immediately and believed that it had been taken care of does not constitute deliberate indifference to plaintiff's medical needs. "Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060. "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

In this case, plaintiff has not presented an issue of material fact demonstrating that defendant disregarded an excessive risk to his safety. Plaintiff argues that Bunker should have been aware of the risk given the poor condition of the wheelchair. Plaintiff further argues that Bunker should have been familiar with the law and operating procedures related to the repair of wheelchairs outlined in the Disability Placement Program Manual and that Bunker should have done more to insure that his wheelchair was repaired. See, Plaintiff's Opposition at Exhibit U.

Indeed, Operation Procedure 403 indicates that MTAs are responsible for logging in and coordinating requests for wheelchair repairs. Id. However, plaintiff also does not dispute the fact that

defendant Bunker called his supervisors and inquired about the status of the wheelchair. UDF 8, 11. Although defendant Bunker did not do what plaintiff thought he should, Bunker's actions indicate that he attempted to take corrective action to address plaintiff's safety by calling his supervisors to ensure that wheelchair was repaired.  As a result, defendant Bunker did not disregard the risk but instead acted in manner that he thought would rectify the situation.  Thus, he was not deliberately indifferent to plaintiff's medical needs or safety.

Plaintiff argues that Bunker should have done more rather than rely on the directive of his supervisors. As a result, plaintiff may argue that Bunker was negligent.  However, even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See, Wood v. Housewright, 900 F.2d at 1334.

Based on the above, defendant Bunker was not deliberately indifferent to plaintiff's serious medical need or safety and did not violate plaintiff's Eighth Amendment rights. Accordingly, the defendant's motion for summary judgment is granted.  Because the court recommends granting defendant's motion for summary judgment  based on the foregoing analysis, the court does not reach defendant's argument that he is entitled to qualified immunity.

H.    Conclusions

Based on the foregoing, IT IS HEREBY ORDERED :

1) Plaintiff's motion for leave to respond to defendant Bunker's reply to plaintiff's opposition to summary judgment is GRANTED;

2) Defendant Bunker's motion for summary judgment based on plaintiff's Eighth Amendment claim is GRANTED, thus concluding this action against defendant Bunker in its entirety.

IT IS SO ORDERED.

**Dated:    September 28, 2007**              /s/ Lawrence J. O'Neill
                                              UNITED STATES DISTRICT JUDGE