# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED BROWN,<br><br>    Plaintiff,<br><br>v.<br><br>EDGAR CASTILLO, et al.,<br><br>    Defendants.<br>_____/ | Case No.: 1:02-cv-06018 LJO DLB PC<br><br>**PRETRIAL ORDER**<br><br><u>Jury Trial</u> (2 days est.): August 10, 2009 at 8:30 a.m., Courtroom 4, before United States District Judge Lawrence J. O'Neill<br><br><u>Telephonic Motions in Limine Hearing</u>: August 7, 2009 at 1:30 p.m., Courtroom 4, before United States District Judge Lawrence J. O'Neill |

Plaintiff Alfred Brown ("Plaintiff") is a state prisoner proceeding in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on plaintiff's First Amended Complaint, filed April 13, 2005, against defendants Castillo, Walker and Mathos ("Defendants") for deliberate indifference to serious medical needs, in violation of the Eighth Amendment of the United States Constitution. A trial confirmation hearing was held in this matter on June 4, 2009 with counsel for Plaintiff and counsel for Defendants appeared telephonically. The Court now issues the instant Pretrial Order.

**I.**    **Jurisdiction and Venue**

The Court has subject matter jurisdiction over this federal civil rights action. 28 U.S.C. § 1331. Venue is proper because the conduct allegedly occurred in this judicial district.

**II.**    **Jury Trial**

The parties request trial by jury.

1

III. **Undisputed Facts**

    I. **Plaintiff's Undisputed Facts**

        a. Plaintiff is serving a life sentence following his November 5, 1998 conviction for first degree murder and being a felon in possession of a firearm.

        b. At the time of the events described in the amended complaint, Plaintiff weighed approximately 350 pounds.

        c. Plaintiff was given a new wheelchair in 1999 when he was housed at High Desert State Prison, where he remained until 2001.

        d. On December 17, 2000, Plaintiff informed prison staff that his wheelchair was broken, and that he was concerned that he might fall out of it and injure himself.

        e. Three days later, Plaintiff was given another new wheelchair by the medical department at SATF.

        f. Plaintiff claims that he noticed that the wheel bearings were going bad in the new wheelchair in February or March 2001.

        g. On July 15, 2001, Plaintiff filed an emergency institutional grievance in an attempt to get the wheelchair repaired.

        h. Defendant Castillo granted Plaintiff's inmate appeal number SATF-E-01-03136 on July 25, 2001, to have the wheelchair repaired or replaced.

        I. On September 4, 2001, Defendant Castillo issued an order for a new wheelchair to be obtained from Invacare.

        j. Within days of receiving Defendant Castillo's order dated September 4, 2001, Medical ADA Coordinator Curtis ordered several new wheelchairs including a wheelchair large enough to accommodate Plaintiff.

        k. A new wheelchair was ordered by special purchase order on September 12, 2001. Delivery was expected to take six to eight weeks.

        l. In November of 2001, the new wheelchair was delivered to E-yard where the Plaintiff was housed, but was too wide for Plaintiff's cell door.

        m. In December of 2001, still no action had been taken regarding the adjustments

       needed to the new wheelchair, and Plaintiff was still using the old wheelchair. Plaintiff filed an additional CDC 1824 once again requesting that his badly deteriorating wheelchair be repaired or replaced.

n. Thereafter, Plaintiff received a response from Medical Appeals coordinator Barbeiro and Defendant Castillo, stating that Defendant Walker would meet with Plaintiff on December 21, 2001 and make the necessary repairs. Defendant Walker did not repair the chair as Barbiero and Defendant Castillo had assured the Plaintiff he would.

o. Despite numerous attempts, Plaintiff was unable to contact Defendant Walker to have the necessary repairs performed.

p. On January 9, 2002, Plaintiff requested an interview with Defendant Castillo. Defendant Castillo did not respond.

q. Defendant Castillo was aware that more than five months had passed since Plaintiff's first appeal had been granted in July of 2001, and Plaintiff was still using the same wheelchair.

r. Before Defendant Walker took over responsibility for wheelchair repair, wheelchairs were repaired in the prison's clinic, but keeping tools and equipment necessary to perform the repairs in the clinic raised security concerns with prison administrators. In late November 2001, it was decided that the wheelchair repairs would be performed in the bicycle repair shop.

s. Defendant Walker was assigned the duties of the bicycle repair shop in May 2001. In November 2001, wheelchair repair was added to his responsibilities.

t. When the responsibility for wheelchair repair was initially shifted from the clinic to the bicycle repair shop, Defendant Walker had no means of collecting the damaged or malfunctioning wheelchairs himself. The recycling officers were assigned the task of going to the various yards to pick up wheelchairs needing repair and delivering them to the bicycle shop. They would pick up the damaged wheelchairs whenever they were notified by the MTA on the yard that a chair

needed repair.

u. During the time of the events giving rise to this suit, Defendant Mathos was working as a Public Health Nurse at SATF.

v. In her capacity as Public Health Nurse, Defendant Mathos was responsible for testing and tracking infectious diseases within the inmate population.

w. Plaintiff admits that he did not receive any lacerations when he was thrown from his wheelchair on January 28, 2002, but did sustain various abrasions and contusions.

ii. **Defendants' Undisputed Facts**

a. Plaintiff is lawfully in the custody of the California Department of Corrections and Rehabilitation following his November 5, 1998 conviction for first degree murder and being a felon in possession of a firearm under California Penal Code §§187(a), 12021(a), 12022.5(a). Plaintiff is serving a sentence of twenty-five years to life for the murder conviction, plus an additional ten years for being a felon in possession of a firearm.

b. All Defendants were employed at California Substance Abuse Treatment Facility and Prison (SATF) at the time of the events described in the First Amended Complaint. Defendant Castillo was employed as Health Care Manager and Chief Medical Officer, Defendant Mathos was employed as Public Health Nurse I, and Defendant Walker was employed as correctional officer.

c. Plaintiff is six feet, eight inches tall, and at the time of the events described in the FAC, weighed approximately 350 pounds.

d. Plaintiff was transferred from High Desert State Prison (High Desert) to SATF on February 3, 2000.

e. Plaintiff was given a new wheelchair in 1999 when he was housed at High Desert State Prison.

f. On July 31, 2000, Plaintiff filed an institutional grievance complaining about the poor condition of the wheelchair he received from High Desert State Prison.

| | | |
|---|---|---|
| 1 | g. | In September 2000, Plaintiff was given a new wheelchair in response to the July 31, 2000 grievance. |
| 2 | h. | On December 17, 2000, Plaintiff informed prison staff that his wheelchair was broken, and the he was concerned he may fall out of it and injure himself. |
| 3 | I. | Three days later, Plaintiff was given another new wheelchair by the medical department at SATF. |
| 4 | j. | Plaintiff noticed the wheel bearings were going bad in the wheelchair he received on December 20, 2000, in February or March 2001, but waited until July 15, 2001 to file an "emergency" request to have the wheelchair repaired. |
| 5 | k. | Defendant Castillo granted Plaintiff's emergency request on July 25, 2001, and ordered that Plaintiff's wheelchair be repaired or replaced. |
| 6 | l. | On September 4, 2001, Defendant Castillo issued an order to have a new wheelchair obtained for Plaintiff from Invacare. |
| 7 | m. | In response to Defendant Castillo's order, on September 12, 2001, Medical ADA Coordinator Curtis placed an order for several new wheelchairs including an extra-large wheelchair to accommodate Plaintiff's size. Delivery was expected to take six to eight weeks. |
| 8 | n. | When the new extra-large wheelchair arrived on November 2, 2001, it was delivered to Plaintiff in his housing unit. |
| 9 | o. | When Medical ADA Coordinator Curtis was notified that the new wheelchair would not fit through Brown's cell door, he advised the Medical Technical Assistant to contact Brown's treating physician to obtain an order to modify the wheelchair. |
| 10 | p. | Plaintiff never contacted Defendant Walker concerning the condition of his wheelchair or repairs to his wheelchair. |
| 11 | q. | When an inmate's wheelchair is too large to fit through the cell door, he can manually push open the cell door wider. This causes the door to lock open. Once the inmate enters the cell, the control booth officer can push a button that releases |


1    g.    In September 2000, Plaintiff was given a new wheelchair in response to the July
2          31, 2000 grievance.
3    h.    On December 17, 2000, Plaintiff informed prison staff that his wheelchair was
4          broken, and the he was concerned he may fall out of it and injure himself.
5    I.    Three days later, Plaintiff was given another new wheelchair by the medical
6          department at SATF.
7    j.    Plaintiff noticed the wheel bearings were going bad in the wheelchair he received
8          on December 20, 2000, in February or March 2001, but waited until July 15, 2001
9          to file an "emergency" request to have the wheelchair repaired.
10   k.    Defendant Castillo granted Plaintiff's emergency request on July 25, 2001, and
11         ordered that Plaintiff's wheelchair be repaired or replaced.
12   l.    On September 4, 2001, Defendant Castillo issued an order to have a new
13         wheelchair obtained for Plaintiff from Invacare.
14   m.    In response to Defendant Castillo's order, on September 12, 2001, Medical ADA
15         Coordinator Curtis placed an order for several new wheelchairs including an
16         extra-large wheelchair to accommodate Plaintiff's size. Delivery was expected to
17         take six to eight weeks.
18   n.    When the new extra-large wheelchair arrived on November 2, 2001, it was
19         delivered to Plaintiff in his housing unit.
20   o.    When Medical ADA Coordinator Curtis was notified that the new wheelchair
21         would not fit through Brown's cell door, he advised the Medical Technical
22         Assistant to contact Brown's treating physician to obtain an order to modify the
23         wheelchair.
24   p.    Plaintiff never contacted Defendant Walker concerning the condition of his
25         wheelchair or repairs to his wheelchair.
26   q.    When an inmate's wheelchair is too large to fit through the cell door, he can
27         manually push open the cell door wider. This causes the door to lock open. Once
28         the inmate enters the cell, the control booth officer can push a button that releases

|    |    |    |
|----|----|----|
| 1  |    | the cell door so the inmate can then manually pull the cell door closed. |
| 2  | r. | On January 28, 2002, Plaintiff was taken to the E facility medical clinic where he was examined by Dr. Deering. Plaintiff was not cut, and Dr. Deering observed no evidence of injury, bruise, or fracture. |
| 5  | s. | On January 29, 2002, Plaintiff went to the Medical Technical Assistant (MTA) to request a "lay-in" that would allow him to remain in bed for three days. |
| 7  | t. | Plaintiff received no further medical treatments related to the January 28th incident after he was seen by Dr. Deering on January 28, 2002. |
| 9  | u. | Before Defendant Walker took over responsibility for wheelchair repair, wheelchairs were repaired in the prison's clinic, but keeping tools and equipment necessary to perform the repairs in the clinic raised security concerns with prison administrators. In late November 2001, it was decided that the wheelchair repairs would be performed in the bicycle repair shop. |
| 14 | v. | Defendant Walker was assigned the duties of the bicycle repair shop in May 2001. In November 2001, wheelchair repair was added to his responsibilities. |
| 16 | w. | When the responsibility for wheelchair repair was initially shifted from the clinic to the bicycle repair shop, Defendant Walker had no means of collecting the damaged or malfunctioning wheelchairs himself. The recycling officers were assigned the task of going to the various yards to pick up wheelchairs needing repair and delivering them to the bicycle shop. They would pick up the damaged wheelchairs whenever they were notified by the MTA on the yard that a chair needed repair. |
| 23 | x. | During the time of the events giving rise to this suit, Defendant Mathos was working as a Public Health Nurse at SATF. |
| 25 | y. | In her capacity as Public Health Nurse, Defendant Mathos was responsible for testing and tracking infectious diseases within the inmate population. |

///

///

IV.  Disputed Facts

    I.  **Plaintiff's Disputed Facts**

        a.  Plaintiff disputes the assertion by Defendants that Plaintiff did not experience any problems with the wheelchair he was provided in 1999, while housed at High Desert State Prison, until 2001.

        b.  Plaintiff disputes the fact that while at High Desert State Prison, he filed an institutional grievance on July 31, 2000, regarding the condition of his wheelchair.

        c.  Plaintiff denies, based on his recollection, that he was provided with an extralarge wheelchair in September of 2000, in response to a July 31, 2000 grievance.

        d.  Plaintiff disputes the claim that adjustments to medical devices were not made by prison staff without a physician's order. To the contrary, such adjustments were routinely made to medical devices by prison staff without a physician's order, especially in the case of wheelchairs.

        e.  The wheelchair intended for Plaintiff, which was delivered to the facility in November of 2001, was too wide to fit through Plaintiff's cell door, making it unusable as Plaintiff does not have the ability to stand or walk on his own.

        f.  Defendant Castillo was aware that the new wheelchair was too wide to fit through Plaintiff's cell and that it would need adjustments. Despite this knowledge, Defendant Castillo took no action to see that the adjustments were made, thereby exhibiting deliberate and callous indifference to Plaintiff's serious medical needs, as well as his safety.

        g.  Despite Plaintiff's numerous pleas to Defendant Walker and his various attempts to contact Defendant Castillo, in late January 2002, Plaintiff still had not received a new wheelchair nor was his old one repaired.

        h.  Defendants Walker, Castillo, and Mathos took no action whatsoever to see to the serious medical needs of the Plaintiff and, in fact, avoided him completely. The Defendants were deliberately indifferent to Plaintiff's condition and medical requirements, including the extreme hardship and risk to his safety that their

7

acts/omissions placed upon the Plaintiff as he attempted to perform his daily activities.

i. Plaintiff disputes the Defendants' claim that Plaintiff did not want to keep the new wheelchair because Plaintiff did not want to be inconvenienced by having to open and close his cell door manually.

j. Defendant Walker was aware of the badly deteriorated condition of Plaintiff's wheelchair, but despite the fact that it was his job to repair the inmates' wheelchairs, he did nothing. Defendant Walker ignored Plaintiff's plea for help, avoided him when he could, and exhibited outright hostility towards the Plaintiff on numerous occasions.

k. One of Defendant Mathos's responsibilities was to log and secure any necessary repairs to wheelchairs.

l. Defendant Mathos, though aware of the condition of Plaintiff's wheelchair and his numerous requests for repairs, failed to take any action whatsoever in the matter. Defendant Mathos exhibited deliberate indifference to the serious medical needs and safety of the Plaintiff.

m. The accident occurring on January 28, 2002, when Plaintiff was thrown from his wheelchair when one of the wheels locked up, was a direct result of the conscious and deliberate indifference of Defendants Walker, Castillo, and Mathos, to Plaintiff's safety and medical needs.

n. Only hours after Plaintiff was thrown from his wheelchair, Defendant Walker confronted Plaintiff in his cell demanding that he take the old wheelchair back, which Defendant Walker claimed had been repaired, but had not.

o. At this time, Defendant Walker stated to Plaintiff that he wanted the new wheelchair that Plaintiff had been given after the accident, and that Plaintiff was to take the old wheelchair back. When Plaintiff refused and stated to Defendant Walker that clearly the old wheelchair had not been repaired, Defendant Walker exhibited extreme hostility towards the Plaintiff.

1  p.  Defendant Walker's course of conduct towards Plaintiff and the open hostility he displayed just hours after Plaintiff was injured due to the wheelchair having gone unrepaired for six months, served to indicated the high degree of deliberate indifference on the part of Defendant Walker to the serious medical needs and safety of the Plaintiff.

r.  Plaintiff disputes the Defendants' claim that he was not injured by the accident, and that no "lay in" was ordered by Dr. Deering after the accident. Plaintiff suffered various abrasions and contusions, as would be expected after a man his size is thrown from his wheelchair.

**ii.  Defendants' Disputed Facts**

a.  Defendants dispute and deny that they were deliberately indifferent to Plaintiff's serious medical needs or safety.

b.  Defendants dispute that Plaintiff suffered any significant injury from the alleged fall on January 28, 2002, or any significant injury from the alleged delay in replacing or repairing his wheelchair.

c.  Defendants dispute that the alleged delay in replacing or repairing Plaintiff's wheelchair was the proximate cause of any of any significant injury to Plaintiff.

d.  Defendants deny that Plaintiff is entitled to any damages or relief of any kind.

e.  Defendants dispute Plaintiff's assertion that he communicated with Defendant Castillo regarding the condition of his wheelchair in December 2001, or that Defendant Castillo made any promises to Plaintiff in December 2001 regarding the repair or replacement of his wheelchair.

f.  Defendants deny and dispute that Plaintiff contacted Defendant Castillo on January 9, 2002.

g.  Defendants deny and dispute that Defendant Castillo was aware that Plaintiff had rejected the new extra-large wheelchair that had been delivered to him on November 2, 2001, or that Plaintiff was still using his old wheelchair after the new extra-large wheelchair was delivered to him in November 2001.

|  |  |  |
|---|---|---|
| | h. | Defendants deny and dispute that the extra-large wheelchair was "unusable," or that Plaintiff would be required to stand or walk in order to get the wheelchair through the door of his cell. |
| | I. | Defendants deny and dispute that Plaintiff made "numerous pleas" to Defendant Walker to have his wheelchair repaired. As Plaintiff admits in his Undisputed Fact "0," he was unable to contact Walker about having repairs made to his wheelchair. |
| | j. | Defendants deny and dispute that Defendant Mathos had any responsibility or involvement in getting Plaintiff's wheelchair repaired or replaced. |
| | k. | Defendants deny and dispute that any of them "avoided" Plaintiff or exhibited hostility toward him. |
| | l. | Defendants deny and dispute that Plaintiff's old wheelchair had not been repaired when Defendant Walker returned it to him on January 28, 2002. |

## V. Disputed Evidentiary Issues

Evidentiary issues concerning the relevancy and admissibility of exhibits shall be resolved at trial or at the motions in limine hearing.

## VI. Special Factual Information

None.

## VII. Relief Sought

Plaintiff seeks money damages, equitable relief and attorney's fees. Defendants seek costs of suit and attorneys' fees.

## VIII. Points of Law

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059

(9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin at 1060 (internal quotations omitted)).  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs.  McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

**IX.  Abandoned Issues**

None.

**X.  Witnesses**

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses. NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(10).

**A.    Plaintiff's Witnesses**

1. Plaintiff Alfred Brown, C.D.C.R. No. J-15695
2. Inmate Lee Edward Hughes, C.D.C.R. No. 5166512
3. Inmate Thurman Gaines, C.D.C.R. No. unknown
4. Medical Technical Assistant Behrens

Plaintiff is reminded that a subpoena will not be served upon an unincarcerated witness by the United States Marshal unless the money order is tendered to the court. Because no statute authorizes the use of public funds for these expenses in civil cases, the tendering of witness fees and travel expenses is required even if the party was granted leave to proceed in forma pauperis. **Plaintiff is advised that the United States Marshal typically requires thirty (30) days to execute**

**service.** Plaintiff is to submit the money order to the Court as soon as possible.

    **B.**    **Defendants' Witnesses**

1. Plaintiff Alfred Brown
2. Defendant Edgar Castillo
3. Defendant Isabel Mathos
4. Defendant Robert Walker
5. Richard Curtis
6. Troy Dulay
7. Dan McGee
8. Dr. D. Deering

**XXI.**  **Exhibits**

The following is a list of documents or other exhibits that the parties expect to offer at trial. NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(11).

    **A.**    **Plaintiff's Exhibits**

1. Emergency C.D.C. 1824. R/M/A/R (Reasonable Modification and Accommodation Request) Appeal [STAF-E-01-03136]. Second Level Response. Granted 7-24-01.
2. Department of Correction, Inmate Appeal Branch (Sacramento) Director's Level, October 9, 2001 Letter to Plaintiff. Re: Appeal # SATF-E-01-03136.
3. C.D.C. 1824 SATF-E-01-05079, R/M/A/R Emergency A.D.A. Appeal
4. Broken Foot Rest, M.T.A. Dart, E-Facility, Broken Foot Rest in Box. C/O R. Walker, D-Yard.
5. Sick Call Slip for Plaintiff by M.T.A. Behrens (12-28-01). For Plaintiff toreturn to E-Facility clinic to place another call to C/O R. Walker about foot rest and wheelchair.

|     |     |                                                                                      |
| --- | --- | ------------------------------------------------------------------------------------ |
| 1   | 6.  | J. Bunker's M.T.A. pass for Plaintiff (1-2-02).                                      |
| 2   | 7.  | C.D.C. 1824 R/M/A/R, Emergency Appeal, SATF-E-01-05079. Resubmitted to appeal coordinator, D. Duvall-CCII. |
| 4   | 8.  | 1-9-02 Inmate Request for Interview (hand written copy) to R.N. Mathos at Central Treatment Center. |
| 6   | 9.  | Declaration and Verification of Thurman Gaines, witness to incident of 1-28-02 in support of claim. |
| 8   | 10. | Incident Report of 1-28-02 concerning unsafe condition of Plaintiff's wheelchair and accident resulting in injury. |
| 10  | 11. | Declaration and Verification of Lee Edward Hughes, witness to exchange between C/O R. Walker and Plaintiff in support of claim. |
| 12  | 12. | Medical "Lay-In" Slips (two day lay-in, dated 1-29-02 instead of 1-28-02)            |
| 13  | 13. | Board of Control Filing. Recommendation: Rejection.                                  |
| 14  | 14. | 2-13-02 Inmate Request for Interview and second 602 to Appeal Coordinator D. Duvall. Re: SATF-E-01-03136 and SATF-E-01-05079. |
| 16  | 15. | Appeal Coordinator Duvall's 2-21-02 response to Plaintiff's 2-13-02 Request for Interview and 602. |
| 18  | 16. | Plaintiff's Response (2-23-02) to Appeal Coordinator Duvall's response on 2-21-02.   |
| 20  | 17. | Plaintiff's 2-24-02 Inmate Request for Interview, informing Appeal Coordinator Duvall that R.N. Mathos is aware of the report and would be able to help her locate the 1824's. |
| 23  | 18. | Director's Level Response to the 1-8-02 resubmission to Appeal Coordinator Duvall.   |
| 25  | 19. | C.D.C. 1824 R/M/A/R - A.D.A. Appeal of 3-12-02 [SATF-E-02-1640].                     |
| 26  | 20. | Inmate Trust Withdrawal for purchase of wheelchair.                                  |
| 27  | 21. | Disability Placement Program, Operation Proc. 403, Maintenance and Repair of Wheelchair. |

    B.    <u>Defendants' Exhibits</u>

        1    Alfred Brown's Abstract of Judgment from his November 5, 1998 conviction.

        2    CDCR form 7219 Report of Injury or Unusual Occurrence dated January 28, 2002.

        3    CDCR form 128-C order for three-day lay-in dated January 30, 2002.

        4    Medical report from Dr. Mark Nystrom, San Joaquin Community Hospital, dated September 25, 2000.

        5    Wheelchair Repair Log showing delivery of a new "heavy duty" wheelchair to Plaintiff on November 2, 2001.

        6    Plaintiff's complete medical file from February 3, 2000 to present.

**XII. Discovery Documents**

None.

**XIII. Further Discovery or Motions**

None. If either party intends to file motions in limine, the procedure and time requirements are set forth below.

**XIV. Stipulations**

The parties stipulate that Plaintiff is serving a life sentence, and that during the events alleged in the First Amended Complaint, Defendants were acting under color of law.

**XV. Amendments-Dismissals**

None.

**XVI. Settlement Negotiations**

This matter is set for settlement conference on June 24, 2009 before Magistrate Judge Nandor J. Vadas.

**XVII. Agreed Statements**

None.

**XVIII. Separate Trial Of Issues**

As is this Court's standard practice, the Court will bifurcate the issue of punitive damages. If the jury finds that Defendants are liable for punitive damages, the Court will conduct a second

phase of trial on the amount of punitive damages.

**IXX.  Impartial Experts - Limitation Of Experts**

None requested.

**XX.  Attorneys' Fees**

The parties seeks attorneys' fees.

**XXI. Trial Exhibits**

No special handling of trial exhibits requested.

**XXII. Miscellaneous**

    **A.  Motions In Limine Hearing and Briefing Schedule**

Motions in limine shall be filed and served no later than **July 31, 2009.**  Responses to motions in limine shall be filed and served no later than **August 5, 2009.**  This Court will conduct a telephonic hearing on the motions in limine on **August 7, 2009 at 1:30 p.m. in** Courtroom 4 (LJO) of this Court.   The parties are to initiate the hearing by calling (559) 499-6580 and are to call together on a single phone line.

    **B.  Trial Briefs**

The parties are relieved of their obligation under Local Rule 16-285 to file trial briefs. If they wish to file trial briefs, they must do so on or before **July 31, 2009**.

    **C.  Jury Instructions and Verdict Forms**

The parties shall serve their proposed jury instructions and verdict forms on one another no later than **July 24, 2009**. The parties shall conduct a conference to address their proposed jury instructions and verdict forms no later than **August 3, 2009**.  At the conference, the parties SHALL reach agreement on jury instructions and a verdict form for use at trial.  The parties shall file and serve all agreed-on jury instructions and an agreed-on verdict form no later than **August 3, 2009** and identify such as the agreed-on jury instructions and verdict form.

In selecting proposed instructions, the parties shall use Ninth Circuit Model Civil Jury Instructions to the extent possible.  All jury instructions must be submitted in duplicate: One set will indicate which party proposes the instruction, with each instruction numbered or lettered, and containing citation of supporting authority, and the customary legend, i.e., "Given, Given as

Modified, or Refused," showing the Court's action, with regard to each instruction. One set will be an exact duplicate of the first, except it will not contain any identification of the party offering the instruction or supporting authority or the customary legend of the Court's disposition. The parties shall provide the Court with a copy of their proposed jury instructions via e-mail at: ljoorders@caed.uscourts.gov.

### D.      Joint Statement of the Case/Agreed Statements

For use during jury voir dire, the parties shall prepare a joint neutral statement of the case, which briefly describes the case, including the claims and defenses. The joint neutral statement shall be filed and served no later than **August 3, 2009**.

### E.      Trial Exhibits

#### i.      Duty to Pre-Mark Exhibits

No later than **July 24, 2009**, the parties shall exchange their proposed exhibits to the extent they have not done so. The parties' counsel shall meet and conduct an exhibit conference no later than **August 3, 2009** to pre-mark and examine trial exhibits and to prepare exhibit lists. All Defendants' exhibits shall be pre-marked with the prefix "D" and numbered sequentially D-1 to D-300. All Plaintiff's exhibits shall be pre-marked with the prefix "P" and numbered sequentially starting with P-300.

#### ii.      Exhibit Lists

No later than **August 3, 2009**, the parties shall file and serve their lists of respective pre-marked exhibits.

#### iii.      Submission of Trial Exhibits and Indexes

No later than **August 3, 2009**, the parties shall submit to the clerk's office all pre-marked trial exhibits. The parties' counsel should note that, pursuant to Local Rule 16-281(b)(11), only those exhibits listed in the parties' exhibit attachment to their pretrial statement will be permitted to be offered into evidence. Therefore, any exhibits submitted which are not listed in the pretrial statement will not be admitted.

#### iv.      Objections

No later than **August 3, 2009**, the parties shall file and serve written objections to

1 exhibits which to which they make foundational or substantive objections.  Such written
2 objections shall reference the exhibit objected to, specifically set forth the objectionable matter in
3 the disputed exhibit, and include a citation to legal authority explaining the grounds for the
4 objection and why the exhibit is not admissible.  A concise argument concerning the disputed
5 exhibit may be included.

      **F.**     **Estimated Length of Trial**

The parties estimate trial will be two days.

**XXII. Objections to Pretrial Order**

Any party may file and serve written objections to any of the provisions of this Order on or before **June 19, 2009.**  Such objections shall specify the requested modifications, corrections, additions, or deletions.  If amendments to this Order result from any written objections, an Amended Pretrial Order will issue.

<div align="center">***</div>

<u>FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER</u>.

IT IS SO ORDERED.

**Dated:**   **June 5, 2009**                         /s/ Lawrence J. O'Neill
                                                UNITED STATES DISTRICT JUDGE